[No. B223566. Second Dist., Div. Two. Mar. 2, 2011.]

CLARENDON AMERICA INSURANCE COMPANY, Plaintiff and Appellant, v.
GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, Defendant and Respondent.

**COUNSEL**

Law Office of Karen-Denise Lee and Karen-Denise Lee for Plaintiff and Appellant.

Haight, Brown & Bonesteel, Denis J. Moriarty, Jules S. Zeman and Florence H. Gerlitz for Defendant and Respondent.

**OPINION**

**CHAVEZ, J.**—Clarendon America Insurance Company (Clarendon) filed a complaint for declaratory relief, equitable contribution, and equitable indemnity against General Security Indemnity Company of Arizona as the attorney in fact for General Security Indemnity Company (General Security) after settling an action against Hilmor Development (Hilmor), a company that both Clarendon and General Security had insured during different timeframes. General Security cross-complained for declaratory relief and the trial court resolved competing motions for summary judgment in General Security's

favor. Clarendon appeals from the final judgment entered after the trial court granted summary judgment against it. We affirm.

## CONTENTIONS

Clarendon contends that the trial court incorrectly interpreted the "products-completed operations hazard" provision of the commercial general liability (CGL) policy issued by General Security, and that the action against Hilmor fell within the scope of General Security's coverage under that provision. Clarendon further contends that exclusions j(5) and j(6) of the General Security policy, as well as the "claims in progress" exclusion of that policy, do not preclude coverage.

## BACKGROUND

Clarendon insured Hilmor under a CGL policy effective July 1, 2000, to July 1, 2001. General Security insured Hilmor under a CGL policy effective July 1, 2001, to July 1, 2002.

On or about September 30, 1999, Hilmor entered into a written construction contract with Haim and Lucinda Revah to serve as the general contractor for the construction of the Revahs' custom single-family home located at 705 North Alta Drive in Beverly Hills, California. The construction contract provided that Hilmor would perform "all work necessary to demolish the existing residence" and to "construct and complete the Improvements in accordance with the Contract Documents." The "Improvements" called for in the construction contract included "construction of a new residence . . . consisting of an approximately 14,000 square foot single family home and related hardscape, landscape, fencing and other improvements." The construction contract provided several conditions that had to be met before the Revahs' home would be considered complete, including, among other things, the recording of a notice of completion and the Revahs' ability to beneficially occupy the entire property.

On May 18, 2001, prior to the completion of the Revah residence, the Revahs terminated their contract with Hilmor. In June 2001, Hilmor assigned all subcontracts to the Revahs as required under the construction contract. It was undisputed that the construction of the Revah residence was not completed at the time of Hilmor's termination from the project. Construction of the residence continued without further participation of any kind from Hilmor. A temporary certificate of occupancy for the Revahs' residence was issued on September 24, 2001.

On November 12, 2004, the Revahs filed an action against Hilmor alleging defects in the construction of their home. (*Revah v. Hilmor Development*

*Corp.* (Super. Ct. L.A. County, 2009, No. BC324407) (the Revah action).) They also sued the general contractor hired to complete construction of their residence, as well as various subcontractors, alleging construction defects and continuing and progressive damage. They alleged that the interior and exterior of their home were damaged as a result of various construction defects.

Hilmor tendered its defense and indemnification in the Revah action to Clarendon. Clarendon accepted the tender and retained the law firm of Pierce & Weiss to defend Hilmor in the Revah action. Clarendon withdrew its defense in May 2006, then later agreed to defend after Hilmor's counsel threatened to file an insurance bad faith lawsuit against various carriers, including Clarendon. Clarendon retained Small, Henstridge, Cabodi & Pyles, which associated in as counsel on or about January 30, 2008.

Hilmor's defense and indemnification had been tendered to General Security on April 14, 2004, by Pierce & Weiss. At first, General Security agreed to participate in Hilmor's defense through Pierce & Weiss. On May 15, 2006, General Security withdrew its defense on the ground that there was no coverage or potential for coverage under the General Security policy because (1) Hilmor did not complete all of the work called for in Hilmor's contract with the Revahs prior to the inception of the General Security policy, therefore the products-completed operations hazard clause was not triggered; and (2) the faulty workmanship exclusions and other exclusions in the General Security policy operated to exclude coverage for the claims and damages asserted by the Revahs.

In October 2008, Clarendon settled with the Revahs, allegedly agreeing to pay its full policy limit of $1 million plus contributions of defense costs that it received from some of the subcontractors that worked on the Revah project. In addition, Clarendon allegedly paid defense fees in the amount of $473,463.29 to the Small, Henstridge, Cabodi & Pyles firm.

## PROCEDURAL HISTORY

On February 13, 2009, Clarendon filed this action against General Security seeking contribution for the amounts Clarendon paid to defend and indemnify Hilmor in the Revah action. General Security filed a cross-complaint for declaratory relief seeking a judicial declaration regarding both its duty to defend and its duty to indemnify Hilmor in the Revah action.

On November 6, 2009, Clarendon filed a motion for summary judgment, or in the alternative summary adjudication, seeking a determination that Clarendon was entitled to contribution from General Security for the amounts Clarendon actually incurred to defend and indemnify Hilmor in the Revah action.

On November 19, 2009, General Security filed its motion for summary judgment, or in the alternative summary adjudication, on the ground that there was no coverage or potential for coverage of the Revahs' claims against Hilmor under the General Security policy.

The parties' motions were heard as cross-motions. On February 4, 2010, the trial court determined that General Security had met its burden of showing that there was no possibility of coverage under the General Security policy. First, the trial court analyzed the products-completed operations hazard clause in General Security's contract. The court held that there was "no triable issue of fact as to whether the products completed operations hazard coverage under Defendant's policy applied here. It did not." The court next determined that exclusions j(5) and (6) of the General Security policy precluded coverage for "property damage arising out of Hilmor's work at the Revahs' residence during construction related to defective work and material or satisfactory work damaged by defective work and materials." Finally, the trial court determined that the "claim(s) in progress" exclusion in Defendant's policy clearly excludes coverage from continuing and progressive property damage that began before the inception of the policy. The trial court denied Clarendon's motion and granted General Security's motion.

On April 5, 2010, Clarendon filed its notice of appeal.

## DISCUSSION

### I. Standards of review of summary judgment

Summary judgment is properly granted when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A moving party is entitled to summary judgment if it establishes a complete defense to the plaintiff's cause of action, or shows that one or more elements of each cause of action cannot be established. (§ 437c, subd. (o); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The moving party bears the burden of showing that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law. (*Aguilar*, at p. 850.)

We review a grant of summary judgment de novo, and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) The trial court's stated reasons for granting summary judgment are not binding on the reviewing court. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].)

Interpretation of General Security's policy is a question of law. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377 [33 Cal.Rptr.3d 562, 118 P.3d 589].) "In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts." (*Id.* at p. 390.) Under those rules, " ' "[t]he fundamental goal . . . is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation].' [Citation.]" (*Id.* at p. 390.) However, if the language of the policy is capable of two or more reasonable constructions, it will be considered ambiguous, and will generally be construed against the party who caused the uncertainty to exist. (*Ibid.*)

With these principles in mind, we turn to the language of General Security's policy.

II. *There is no coverage under the "products-completed operations hazard" provision*

General Security's policy specifies that it only covers "bodily injury" or "property damage" caused by an "occurrence" that takes place in the "coverage territory" and occurs "during the policy period." It is undisputed that Hilmor did not work on the Revah project during the time period when General Security's policy was in effect.

The products-completed operations hazard provision in General Security's policy is designed to cover property damage that occurs after an insured's work is completed. Clarendon's claims against General Security for equitable contribution and equitable indemnity were based on its argument that coverage of the claims in the Revah action exists under this provision.

A. *The definition of "products-completed operations hazard"*

General Security's policy defines the "products-completed operations hazard" as follows:

"a. Includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except:

"(1) Products that are still in your physical possession; or

"(2) Work that has not yet been completed or abandoned. However, 'your work' will be deemed completed at the earliest of the following times:

"(a) When all of the work called for in your contract has been completed.

"(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one jobsite.

"(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

"Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

This definition plainly includes all property damage occurring away from the insured's premises and arising out of the insured's work or products, with the exception of (1) products still in the insured's possession, and (2) work that has not yet been completed or abandoned.

> B. *The Revah action falls under the exception for work not completed or abandoned*

Hilmor's work on the Revah residence ended on May 18, 2001, when Hilmor was fired from the job. The letter from Haim Revah to Hilmor on that date specifies that its purpose is to give Hilmor "notice of our termination of Hilmor Development as contractor" with respect to the project. The letter made it clear that work was not complete on the project, indicating that "there are several months of work remaining" which a new general contractor would need to oversee. The Revahs specifically reserved "any rights that we have under the Residential Construction Contract."

Under these undisputed facts, the products-completed operations hazard coverage does not apply. Subdivision a(2) of that provision specifies that the coverage does not apply to work that has not yet been completed or abandoned. It was undisputed that Hilmor did not complete the work it had been hired to do, which was to oversee construction of the Revahs' single-family home. Under the contract, Hilmor's work could not be considered

complete until, among other things, the recording of a notice of completion and the Revahs' ability to beneficially occupy the entire property. There is no dispute that these events did not occur until a new general contractor took over and completed the work. While Hilmor's last day on the job was May 18, 2001, a temporary certificate of occupancy was not issued until September 24, 2001. There is no triable issue of fact as to whether "all of the work called for in [Hilmor's] contract" was completed. It was not.

Nor is there any triable issue as to whether Hilmor "abandoned" the job. The term "abandon" is traditionally used where "both sides to a contract expressly announce their intention to abandon it, releasing both sides from their respective duties under the contract . . . ." (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 253 [115 Cal.Rptr.2d 900, 38 P.3d 1120].) Abandonment in the construction context also results from the aggregation of numerous changes to the contract over time. (*Ibid.*) There is no evidence that either party intended to abandon the contract at the time of Hilmor's termination. In fact, the Revahs expressly retained their rights under the contract. Nor was there evidence that an excessive number of changes to the scope of work resulted in abandonment. As Clarendon's counsel admitted at oral argument, Hilmor "didn't abandon the project."

Hilmor's work had not been completed, nor had it been abandoned. Instead, Hilmor was terminated from the job before it completed its work. Under the plain language of the policy, the products-completed operations hazard does not apply.

C. *Clarendon has failed to create a triable issue of fact as to whether the Revah claim was within the scope of the products-completed operations hazard*

1. *The work was not completed or abandoned*

Clarendon's position is that the work called for under the contract was completed. Clarendon's theory is that regardless of the original terms of the contract, the Revahs' termination of Hilmor terminated Hilmor's obligations under the contract. Thus, Clarendon argues, Hilmor's work on the project was finished for the purposes of the products-completed operations hazard provision.

Clarendon cites *Hollypark Realty Co. v. MacLoane* (1958) 163 Cal.App.2d 549 [329 P.2d 532], as authority for its position that the Revahs' termination of the contract terminated any obligations owed under the contract. *Hollypark* concerns a contract for the purchase and sale of real property, and provides no guidance on the applicability of the products-completed operations hazard provision in this matter.

■ Clarendon cites foreign authority, which it claims is relevant. These cases are not binding on this court, and may be considered as persuasive authority at best. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 490 [87 Cal.Rptr.3d 275, 198 P.3d 66].) We discuss them in order to fully address Clarendon's arguments.

First, Clarendon cites *Allied Mutual Ins. Co. v. Hingst* (D.N.D. 1973) 360 F.Supp. 1204, which it describes as "strikingly similar" to the matter before us. In *Allied*, the insured, Hingst, contracted to construct a building on a farm owned by the Klostermans. Hingst began work on the building but left the project when necessary materials did not arrive on schedule. (*Id.* at p. 1207.) When the materials did arrive, the Klostermans called Hingst to return to the project, but Hingst was delayed due to his work on a different project. The Klostermans therefore decided to have the work completed by another contractor, Vernon Brosowski. During the course of Brosowski's employment, Tveter, an employee of Brosowski, was injured. Hingst at no time returned to work on the project, and there was no evidence that the parties intended to reserve any rights under the contract after Brosowski was hired to complete the building. The court specifically determined that "the parties by mutual consent had terminated the contract and Hingst had abandoned the project prior to the date of the Tveter accident." (*Ibid.*)

Here, in contrast, there was no mutual intent to abandon the contract. Instead, the uncontested facts show that Hilmor was unilaterally fired by the Revahs. In addition, the Revahs reserved their rights under the residential construction contract and specifically noted that Hilmor's work on the project was not complete. These facts differentiate this matter from the facts in *Allied*, and the case does not persuade us that Hilmor's work was completed or abandoned as required under the products-completed operations hazard clause in the General Security policy.

Next, Clarendon cites a South Carolina case, *Laidlaw Environmental Services (TOC), Inc. v. Aetna Casualty & Surety Co.* (Ct.App. 1999) 338 S.C. 43 [524 S.E.2d 847] (*Laidlaw*). Laidlaw contracted with Radco to construct a "baghouse" for Laidlaw's hazardous waste incineration system. Radco abandoned the project, and Laidlaw hired another contractor to finish the project. When placed into operation, the baghouse leaked. Laidlaw sued Radco, which was insured by Aetna. The Aetna policy specified that it did not apply to injury or damage included within the products-completed operation hazard clause. (*Id.*, 524 S.E.2d at p. 848.) Aetna took the position that the claims against Radco fit within the products-completed operations hazard coverage, which Radco had not purchased. Therefore Aetna did not believe that there was any potential for coverage. (*Id.* at p. 849.)

■ As part of a settlement, Radco assigned its rights against Aetna to Laidlaw, which later sued Aetna. Aetna was granted summary judgment in the trial court on the ground that products-completed operations coverage had been specifically rejected by Radco. (*Laidlaw, supra*, 524 S.E.2d at pp. 849–850.) On appeal, the court affirmed that Radco's abandonment of the work on the baghouse brought Laidlaw's claims within the scope of the products-completed operations clause. Significantly, the court pointed out that both parties agreed that Radco abandoned the work. (*Id.*, at p. 850.) The court explained that "when an insured abandons work on a project the insured has effectively 'completed' its work for that project, even if the project remains unfinished, thus invoking products-completed operations coverage." (*Ibid.*)

As explained above, the undisputed facts of this case do not support a finding that Hilmor abandoned its work on the Revah project. Unlike Radco, Hilmor was fired. Nor have the parties before us agreed that Hilmor abandoned the work. In fact, Clarendon's counsel admitted at oral argument that no abandonment occurred in the present case. *Laidlaw* did not address the application of a products-completed operations hazard clause under the circumstances of this case, and does not convince us that such coverage is applicable here.

### 2. *Hilmor's work was not put to its intended use under paragraph a(2)(c) of the policy*

The products-completed operation hazard provides coverage for injury and damage "arising out of 'your product' or 'your work' " with the exception of work "that has not yet been completed or abandoned." (Par. a(2).) However, under the policy, "your work" is "deemed completed" under three specific circumstances. Under paragraph a(2)(c), "your work" is deemed completed: "(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."

Clarendon argues that Hilmor's work should be deemed completed under this provision. Clarendon points out that it is undisputed that a temporary certificate of occupancy was issued on September 24, 2001, at which time the house was put to its intended use as a residence. In addition, there is no evidence that the work done by Hilmor was demolished or otherwise not used in the completion of the construction. Thus, Clarendon argues, it is logical to conclude that the work of Hilmor was included in the final construction of the home and thus put to its intended use no later than September 24, 2001, during the term of General Security's policy. Even though it was not "complete," Clarendon states, Hilmor's work was put to its intended use.

We find that this paragraph does not suggest a potential for coverage under the circumstances of this case. Hilmor's unfinished work was taken over by another contractor. Paragraph a(2)(c) specifies that it applies when "that part of the work done at a job site [is] put to its intended use by any person or organization *other than another contractor or subcontractor working on the same project*." (Italics added.) This is precisely what happened here—another contractor put Hilmor's unfinished work to use. By the time the Revahs put their home to its intended use as a residence, it was no longer Hilmor's work.[1] In sum, Hilmor's partial work was never put to its intended use by any person or organization other than the subsequent contractor. This paragraph does not apply.

### D. *The foreign authority cited by General Security is relevant and persuasive*

Like Clarendon, General Security relies on foreign authority to bolster its arguments. While we are not bound by these cases as precedent, we find that they provide support for our interpretation of the products-completed operations hazard provision.

In *McGowan v. State Farm Fire & Casualty Co.* (Colo.App. 2004) 100 P.3d 521, the Colorado Court of Appeals confronted facts similar to those before us. The McGowans hired Eagle Summit Construction Co. to build a house for them. When the work was not yet complete, the McGowans discovered that the house had several structural problems. The McGowans fired Eagle Summit and hired another contractor to complete the project. (*Id.* at p. 522.) State Farm had issued two consecutive one-year contractors policies to Eagle Summit, but refused to defend or provide coverage when the McGowans sued Eagle Summit. The McGowans obtained a default judgment against Eagle Summit and attempted to collect it through a garnishment of insurance proceeds from State Farm. (*Id.* at p. 523.) The Court of Appeals agreed with the trial court in holding that there was no coverage under the products-completed operations hazard provision. The Court explained: "Here, numerous allegations in the complaint in the underlying action referred to the McGowans' need to hire other contractors to 'complete the house as contracted.' Because the work was allegedly not completed when the damage occurred, the property damage does not fit within the policy definition of a

---

[1] The policy defines "your work" as: "a. Work or operations performed by you or on your behalf; and [¶] b. Materials, parts or equipment furnished in connection with such work or operations."

products-completed operations hazard." (*Id.* at p. 526.) Similarly, the undisputed facts before us show that Hilmor's work had not been completed when the damage occurred. Instead, the Revahs hired another contractor to complete the project.[2]

*Vintage Contracting, L.L.C. v. Dixie Building Material Co.* (La.Ct.App. 2003) 858 So.2d 22, also provides guidance. Vintage was hired to construct a new residence in Louisiana. In connection with the project, Vintage obtained a CGL policy from Maryland Casualty Company, Inc., which contained a products-completed operations hazard provision. Vintage contracted with Dixie to furnish concrete for a concrete slab. However, the project engineer refused to certify the slab based on failure to comply with contract specifications. Vintage later made a demand against Dixie and Maryland in connection with losses suffered as a result of removal and replacement of the slab. Maryland declined coverage under the policy, and brought a successful motion for summary judgment when sued. (*Id.* at pp. 24–25.) The Louisiana Court of Appeal affirmed, explaining that completed-operations hazard coverage "refers to the insured's exposure to liability arising out of completed work performed away from his premises." (*Id.* at p. 29.) There was no coverage because "Vintage's contract was not complete nor was part of the work put to its intended use by someone other than another contractor or subcontractor working on the same project." (*Ibid.*)

Significantly, the Louisiana court rejected Vintage's argument that the products-completed operations hazard provision was ambiguous, stating that the clause was "clear and unequivocal. In order for this coverage to apply, the work must have been completed or abandoned, neither of which occurred in this case." (*Vintage Contracting, L.L.C. v. Dixie Building Material Co., supra,* 858 So.2d at pp. 29–30.) The same analysis applies to the matter before us.

Finally, in *Century Indemnity Co. v. Golden Hills Builders, Inc.* (2002) 348 S.C. 559 [561 S.E.2d 355] (*Century*), the Supreme Court of South Carolina answered certain questions certified by the United States Fourth Circuit Court of Appeals. The relevant facts were as follows: the homeowners filed an action against the general contractor (the insured) alleging that a subcontractor of the insured constructed the stucco exterior of their home in a

---

[2] Clarendon attempts to distinguish *McGowan* on the ground that "there was conclusive evidence that the damage happened while the insured's work was on-going." Clarendon argues that "[t]here is no evidence of any damage happening while Hilmor Development was still working on the project. There is no evidence of the property damage happening before the home was put to its intended use. There is no evidence at all of when the damage first happened. In the absence of such evidence, General Security cannot say the damage did not happen after Hilmor Development's work was 'completed' as that term is used in its policy." We are not persuaded by this argument as the uncontradicted evidence shows that Hilmor *never* completed the work that it contracted to perform.

faulty manner that caused moisture damage. The relevant insurance policy ran from December 7, 1989, through December 7, 1990. The residence was deeded to the homeowners on February 22, 1991. It was stipulated by the parties that the damage began occurring prior to December 7, 1990.

The South Carolina Supreme Court determined that there was no liability under the policy because coverage was excluded under the faulty workmanship provision. (*Century, supra,* 561 S.E.2d at p. 359.) However, the court was also asked, "If the coverage is precluded by the faulty workmanship provision, is that coverage restored by a provision that provides coverage for damage arising from products-completed operations hazards?" (*Ibid.*) The court also answered this question in the negative, finding that "the products-completed operations hazard does not include 'property damage' which arose out of Insured's work that had not yet been completed," and that the insured's work had "clearly not been completed at the end of the policy period." (*Ibid.*) Similarly, in our case, the insured's work had definitely not been completed prior to the end of General Security's policy period. Because the insured was fired, it never completed its work.

██ Clarendon argues that "not one of the cases cited by General Security held that a contractor whose contract is terminated cannot have 'completed operations.'" Although no case has made such a sweeping statement, the persuasive authority described above supports the conclusion that we reach here: when a contractor has not completed the work it was hired to do, the products-completed operations hazard provision does not apply. Hilmor did not complete the job, thus the coverage was not triggered.

The products-completed operations hazard coverage applies only where the insured's work has been completed, as specifically described in the policy, or abandoned. Neither of those circumstances exists here, thus the products-completed operations hazard does not, as a matter of law, provide coverage.

III. *Exceptions to coverage*

We have determined that the products-completed operations hazard provision in General Security's policy does not provide coverage for the underlying claims against Hilmor. However, General Security has set forth two alternative grounds for summary judgment: exclusions j(5) and (6) of the policy, also known as the faulty workmanship exclusions, and the claims in progress exclusion. We discuss these provisions briefly below, and agree that they support a grant of summary judgment in favor of General Security.

A. *The faulty workmanship exclusions*

Exclusions j(5) and (6) provide:

"This insurance does not apply to: . . .

" 'Property damage' to: [¶] . . . [¶]

"(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or

"(6) That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

■ These faulty workmanship exclusions preclude coverage for deficiencies in the insured's work. As explained in *Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 967 [270 Cal.Rptr. 719] (*Maryland Casualty*): "Generally liability policies . . . are not designed to provide contractors . . . with coverage against claims their work is inferior or defective [Citation.] The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. [Citations.] Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products." In other words, "[t]he contractor bears the risk of repairing or replacing faulty workmanship, while the insurer bears the risk of damage to the property of others. [Citation.]" (*Blanchard v. State Farm Fire & Casualty Co.* (1991) 2 Cal.App.4th 345, 348–349 [2 Cal.Rptr.2d 884].) In *St. Paul Fire & Marine Ins. Co. v. Coss* (1978) 80 Cal.App.3d 888, 893 [145 Cal.Rptr. 836], the court explained, "[i]n our present case, the defective materials and workmanship concededly produced an inferior home[;] . . . poor workmanship on the delivered product is not 'property damage' within the terms of the general comprehensive liability policy . . . ." (See also *Maryland Casualty, supra*, 221 Cal.App.3d at p. 969 ["we do not believe inferior materials or workmanship themselves constitute 'property damage' "].) Exclusions j(5) and (6) show that the parties to the General Security policy intended that Hilmor bear the risks of faulty workmanship or defective materials.

The exclusion found in j(5) applies to works in progress. The insurer is not obligated to indemnify a policyholder for property damage that occurs while the insured is performing operations on that property. Thus, if the Revahs' claims encompassed property damage that occurred while Hilmor or its subcontractors were performing operations on the property, no coverage would exist.

The exclusion found in j(6) excludes coverage for the physical injury to, or loss of use of, that part of the property that must be replaced because Hilmor's work was performed incorrectly. This precludes coverage for the claims asserted by the Revahs against Hilmor, which were based on alleged "defects and deficiencies" in the residence resulting from poor workmanship and/or materials. As such, the claims are specifically excluded from coverage under paragraph j(6) of General Security's CGL policy. The faulty workmanship provisions thus provide support for a grant of summary judgment in General Security's favor.

Clarendon argues that paragraph j(6) does not exclude coverage for damage to the work of *others* caused by the insured's faulty work. Clarendon proposes that *if* some of the damage at issue in the Revah action constituted damage to work done by other contractors, that part of the claim would not be barred by this exclusion. We reject this argument. The list of observed defects and deficiencies that the Revahs attached to their complaint against Hilmor does not reference any damage to the work of others, it simply lists faulty work which must be repaired or replaced. In addition, Clarendon has failed to cite to any specific examples of damage to the work of others that might have been caused by Hilmor's allegedly faulty work. In the absence of such specific evidence, Clarendon's speculation may not create a triable issue of fact. (*Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1404 [78 Cal.Rptr.3d 361] ["To defeat summary adjudication, plaintiffs could not rely on assertions that are 'conclusionary, argumentative or based on conjecture and speculation,' but rather were required to 'make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact . . . .' "].)

### B. *The claims in progress exclusion*

The "Claim(s) in Progress Exclusion" in General Security's policy provides:

"1. The Policy shall not apply to bodily injury or property damage, which begins or takes place before the inception date of coverage, whether such bodily injury or property damage is known to an insured, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving, and even though the occurrence causing such bodily injury or property damage may be or involve a continuous or repeated exposure to substantially the same general harm.

"2. All property damage to units of or within a single project or development, and rising from the same general type of harm, shall be deemed to

occur at the time of damage to the first such unit, even though the (existence), nature and extent of such damage or injury may change and even though the occurrence causing such property damage may be or involve a continuous or repeated exposure to substantially the same general harm which also continues or takes place (in the case of repeated exposure to substantially the same general harm) during the policy term." Under the terms of this exclusion, the General Security policy does not apply to property damage which began or took place before July 1, 2001, the date that General Security's policy became effective.

There was evidence that the continuing and progressive property damage of which the Revahs complained began prior to the inception of the General Security policy. A letter dated April 27, 2006, from Clarendon's counsel states "[t]he discovery that has transpired since the date of denial has revealed that property damage may very well have resulted prior to July 1, 2001."

Clarendon argues that there was never a finding as to when the damage first happened, and that the letter referenced by General Security provides nothing more than speculation that the damage may have begun prior to the inception of the General Security policy. However, General Security has already shown that any damage arising after Hilmor was fired is not eligible for coverage under the products-completed operations hazard provision. The claims in progress clause strengthens General Security's position by precluding any possibility of coverage for damage which began or took place prior to the effective date of the General Security policy: July 1, 2001.

IV. *Summary judgment was properly granted*

The policy issued to Hilmor by General Security covered only "bodily injury" or "property damage" arising out of Hilmor's work caused by an "occurrence" taking place "during the policy period." There is no question that Hilmor did not work on the Revah project during the period covered by the policy.

The products-completed operations hazard provision provides coverage for "bodily injury" or "property damage" arising out of Hilmor's work or product, with the exception of "[w]ork that has not yet been completed or abandoned." Because Hilmor never completed or abandoned its work on the Revah project, there was no coverage under the products-completed operations hazard provision.

In addition, the faulty workmanship provisions found in paragraphs j(5) and (6) preclude coverage for poor workmanship and materials, which form the basis for the Revahs' action against Hilmor.

Finally, the claims in progress exclusion excludes coverage for continuing and progressive property damage beginning prior to the inception of the General Security policy.

Whether the claims asserted against Hilmor in the Revah action arose from damage occurring while Hilmor was on the job, or after Hilmor left the job, General Security has met its burden of proving that there was no potential for coverage of the Revahs' claims under the policy that it issued to Hilmor. General Security was therefore entitled to summary judgment as a matter of law. (*Powerine Oil Co., Inc. v. Superior Court, supra*, 37 Cal.4th at p. 390.)

## DISPOSITION

The judgment is affirmed. General Security is entitled to its costs of appeal.

Boren, P. J., and Ashmann-Gerst, J., concurred.