Filed 11/2/21

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| ALLEN LETGOLTS et al., | B306905 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC537637) |
| v. | |
| DAVID H. PIERCE & ASSOCIATES, PC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge. Affirmed.

Timothy D. McGonigle Professional Corporation and Timothy D. McGonigle for Plaintiffs and Appellants.

Freeman Mathis & Gary, Frances M. O'Meara, Stephen M. Caine and Holly M. Teel for Defendants and Respondents.

_____

A case within a case can arise when a legal malpractice suit accuses lawyers of poor work. The *main case* is the malpractice suit: were the defendant lawyers' performances deficient? The *case within the case* is whether the lawyers' performances mattered. If the underlying suit on which the lawyers worked lacked merit, then their alleged malpractice could not have had an impact, because the client would have lost anyway. The issue is causation: whether possible malpractice could have caused harm. (See *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239–1240.)

This appeal follows that pattern.

Married couple Allen Letgolts and Gabriella Plattner hired a law firm to get money from an insurance company: National Contractors Insurance Company, Inc. But National's policy was a special and narrow kind of manuscript policy that excluded the kind of *construction defect* claims Letgolts and Plattner were pursuing. Plaintiffs Letgolts and Plattner also asserted a claim for *personal injury* from when Plattner fell down stairs. National's policy did cover personal injuries. But Plattner's tardy and uncorroborated claim was at odds with the detailed lists of problems Plattner herself gave the insurer years before. Plattner thus effectively impeached herself. The trial court implicitly rejected Plattner's testimony about her personal injury claim. We credit this implied credibility determination.

As a result, the trial court rejected the legal malpractice suit against the defendant law firm because pursuing insurance money from National was a lost cause from the start. This ruling was correct: whether the law firm committed malpractice did not matter, because Letgolts and Plattner could not have won their insurance case. We affirm.

I

Letgolts and Plattner are the plaintiffs and appellants. They had a bad experience remodeling their home in 2008. The fallout continues today, 13 years later, with this appeal.

The defendants and respondents in this legal malpractice case are the law firm of David H. Pierce and Associates, P.C., and Charles Pressman, who is a lawyer with that firm. We refer to this firm and Pressman collectively as Pierce.

We summarize the facts in three phases.

First is the 2007 to 2010 time frame. In these years, Letgolts and Plattner hired contractor Boris Pinchevskiy to remodel their home. Pinchevskiy made a mess of the project and then walked away, so Letgolts and Plattner sued him and others.

The second phase is 2010 to 2015, which was a quiescent interval.

The third phase is 2015 to 2020, which produced forward motion in the dispute, culminating in a 2020 bench trial. The trial court ruled against Letgolts and Plattner, who now appeal.

We describe these three phases.

A

The first factual phase was from 2007 to 2010. This phase began with Letgolts and Plattner planning their home remodel and room addition. This remodel ended in litigation.

Letgolts and Plattner planned their remodel with care, according to their later unverified complaint. Their allegations tell this story.

In 2007, Letgolts and Plattner consulted Maritza Hartnett, an insurance agent who had helped them obtain car insurance, homeowners insurance, flood insurance, and earthquake insurance. Plattner, a practicing lawyer, told Hartnett about the

planned remodel. Plattner said it would be major: it would take some of their home "down to the studs." Plattner wanted full insurance against all hazards.

Hartnett assured Plattner her existing homeowners policy with Fire Insurance Exchange fully covered the situation.

Hartnett was wrong: the Fire Insurance Exchange policy *excluded* property damage caused by "construction activities." "Construction activities" were what Plattner and Letgolts wanted Pinchevskiy to undertake.

Plattner and Letgolts alleged that, had Hartnett accurately disclosed that the Fire Insurance Exchange policy excluded property damage caused by construction activities, they would have obtained different insurance or a similar product, such as a bond, to protect them against the risk of construction-related property damage.

In reliance on Hartnett's bad advice and with no bond or other insurance, Letgolts and Plattner signed a contract with Pinchevskiy on December 8, 2007. His crew began demolition.

On January 15, *2008*, an event central to this appeal either did, or did not, occur. In *2020*, Plattner would claim she fell down a home staircase Pinchevskiy allegedly had rebuilt in a negligent way. Plattner in 2020 portrayed the supposed fall as serious: "On January 15, 2008, I fell down the unfinished stairs at the job site and suffered a concussion, lacerations, muscle strain, and tendonitis and sought care from a physician."

We will return to the uncertainty surrounding this alleged January 15, 2008 fall and Plattner's alleged concussion, lacerations, and medical care. For now, we continue in chronological order.

4

As 2008 progressed, Pinchevskiy botched the home remodel. He had cashed six figures of prepayment from Letgolts and Plattner and demolished parts of their home, but he abandoned the unfinished job on July 1, 2008. His negligence caused extensive damage to the home. Plattner claimed Pinchevskiy left the place "completely uninhabitable."

Later in 2008, Letgolts and Plattner sought relief from Pinchevskiy and his insurer National.

Pinchevskiy went bankrupt. National became insolvent. Neither is party to this suit.

On September 11, 2008, Plattner wrote a claims letter to Pinchevskiy's insurance broker to make a claim against National. Plattner enumerated her problems with the home remodel:

1. Pinchevskiy had promised the job would be done by April 1, 2008, but it was not;
2. Pinchevskiy walked off the job, leaving electrical, plumbing, and framing work incomplete;
3. Gas pipes were left unconnected;
4. Water pipes were not configured for proper drainage;
5. The electrical sub-panel was inadequate for the house and the main electrical panel was not connected; and
6. Walls and ceilings Pinchevskiy had removed contrary to plans required further foundation work and bracing of remaining walls.

In this letter, Plattner did not mention falling down stairs, her concussion, her lacerations, or her medical expenses. Plattner signed her claims letter "Plattner Law Office" with a Century City address different from her home address.

On January 20, 2009, Plattner sent National's insurance adjuster another letter detailing her claims against Pinchevskiy. Plattner now itemized 19 problems:

1. Pool shed destroyed;
2. Air conditioning pipes and wires cut;
3. Spiral staircase removed and door frames destroyed;
4. Foundation undermined, causing floor above to sag;
5. Drain pipes cut;
6. Wood floors destroyed;
7. Brick patio torn up and more drain pipes cut;
8. Electrical lines to sub-panel cut and all existing wiring removed in house;
9. Windows damaged;
10. Fireplace damaged;
11. Previously existing wiring replaced with inferior product;
12. Door frames damaged and destroyed;
13. Gas and water lines poorly connected and left unconnected under the floorboards;
14. Wall built jutting out from house by six inches;
15. Security system destroyed;
16. Sprinkler system destroyed;
17. Driveway destroyed;
18. Excessive dirt excavation causing floor to sink over two inches; and
19. Excavation leaving driveway without lateral support, causing it to crumble.

As we have just listed, item three described Pinchevskiy's removal of a spiral staircase. Plattner's letter did not mention a

defectively reconstructed staircase, Plattner's fall, her concussion, her lacerations, or her medical treatment.

Letgolts and Plattner retained attorney Scott Marks, who on November 13, 2009, filed a complaint against three defendants:

1. Fire Insurance Exchange, which the complaint identified as Letgolts and Plattner's home insurer;
2. Hartnett, the insurance agent who advised Letgolts and Plattner about insurance; and
3. Pinchevskiy.

This complaint alleged Hartnett assured Letgolts and Plattner their existing homeowners policy with Fire Insurance Exchange would cover possible property damage by Pinchevskiy. Relying on Hartnett's advice, Letgolts and Plattner did not obtain a bond or other insurance. Then Pinchevskiy damaged their property during his bungled remodeling effort. Letgolts and Plattner sought to hold Hartnett, Fire Insurance Exchange, and Pinchevskiy liable for the property damage Pinchevskiy caused.

Hartnett and Fire Insurance Exchange are not parties to this appeal.

This 2009 complaint mentioned "property damage" in 19 different paragraphs. The complaint did not mention a staircase, a fall down it, a concussion, lacerations, or medical treatment for Plattner.

On February 2, 2010, National's coverage counsel responded to Plattner's claims letters with a 26-page analysis of why National had no duty to defend or indemnify Pinchevskiy against the lawsuit by Letgolts and Plattner. This analysis summarized the dispute and stated counsel "would appreciate being advised of any corrections or comments" about its account

7

of the situation. The parties call this document the "claims rejection letter."

This letter reviewed why National's policy did not cover Plattner's claims. The letter mentioned coverage counsel's independent investigation of Plattner's claims.

The letter does not allude to a supposed fall by Plattner, a concussion, lacerations, or medical treatment. Nor is there a reference to "stairs," apart from item three, quoted above, reciting Plattner's report of "Spiral staircase removed and door frames destroyed."

Letgolts and Plattner did not complain the claims rejection letter omitted Plattner's injuries from falling down stairs.

B

The second factual phase is from 2010 to 2015. Little happened. Attorney Marks had sued Pinchevskiy, Hartnett, and Fire Insurance Exchange on behalf of Letgolts and Plattner. The suit against Pinchevskiy proceeded glacially.

Although Pinchevskiy did not retain counsel, Marks failed to obtain a default judgment against him. Marks withdrew from the case in July 2012. Marks is not a party to this appeal.

After their disappointing experience with attorney Marks, Letgolts and Plattner retained a second round of attorneys: Pierce. Pierce secured a default judgment against Pinchevskiy, but it took Pierce until June *2015* to do this. Pierce's theory against National was that it had wrongfully failed to defend Pinchevskiy and therefore was liable for the entire judgment against him. But National filed for liquidation before Pierce could collect on the judgment.

In sum, by 2015, Pierce had gotten Letgolts and Plattner a judgment about the 2008 remodeling fiasco, but the judgment

was uncollectable against both Pinchevskiy, who was bankrupt, and National, which was defunct.

C

The third factual phase is from 2015 to 2020. In these years, Letgolts and Plattner sued Pierce for malpractice. The case proceeded to a bench trial, which Letgolts and Plattner lost. We detail these events.

For the third time, Letgolts and Plattner retained counsel. The purpose now was to sue their previous lawyers for legal malpractice.

This malpractice case is the one currently on appeal. Letgolts and Plattner originally filed this case many years ago. They filed the operative pleading—the Fifth Amended Complaint—in 2018. This pleading accused Pierce of negligent delay in seeking recovery from Pinchevskiy's insurer, National. The allegation was that Pierce could have secured payment for Letgolts and Plattner from National, but Pierce's slow pace let National slip into liquidation. Letgolts and Plattner alleged Pierce thereby lost them millions of dollars of a potential recovery from National.

To defend against this legal malpractice by Letgolts and Plattner, Pierce used the mechanism of a case within a case. Pierce's lawyers argued Letgolts and Plattner could never have prevailed against National because they never presented a claim covered by Pinchevskiy's policy with National. So, these defense lawyers asserted, Pierce's alleged sluggishness did not matter: no insurance recovery ever was possible from National. Therefore, they reasoned, Pierce's alleged malpractice could not have made a difference.

On February 5, 2020, the trial court held a one-day bifurcated bench trial. One witness testified: Plattner. The court determined Pierce's defense was valid and entered judgment against Letgolts and Plattner, who now appeal.

## II

We independently review the trial court's legal rulings and deferentially review its factual findings.

Familiar malpractice and insurance law is the backdrop to this review. Letgolts and Plattner sued Pierce on the legal malpractice theory that Pierce was unprofessionally slow: had the law firm moved with professional dispatch, it could have secured and enforced a judgment against Pinchevskiy that National, while solvent, could have satisfied. Pierce's defense was that Letgolts and Plattner never presented a claim within National's policy, meaning the insurance company had no duty to Pinchevskiy to defend or to indemnify him against Letgolts and Plattner. According to Pierce, this meant Letgolts and Plattner never stood a chance of securing an enforceable judgment that National would have paid, so any alleged malpractice by Pierce could not have harmed them. The trial court accepted this theory and ruled for Pierce. Letgolts and Plattner protest this ruling by arguing National had a duty to indemnify and, at the very least, to defend Pinchevskiy, given the claims Letgolts and Plattner had raised against him. (See *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295–300.)

Our analysis is in three steps.

First, we examine the National insurance policy at the center of this case.

Second, we determine the trial court correctly interpreted this policy to exclude the *construction defect* claims by Letgolts and Plattner.

Third, we assay the *personal injury* claim. Plattner testified at the bench trial she hurt herself by falling down a defectively constructed staircase. This testimony was in 2020 about an event that Plattner said was in 2008. The trial court did not expressly reject Plattner's tardy injury claim on credibility grounds. That implicit finding, however, is the necessary implication of the court's ruling. We ascribe this credibility finding to the trial court, which dooms Plattner's personal injury claim.

A

National sold contractor Pinchevskiy a particular and specialized kind of insurance policy. It was a manuscript policy rather than a standard general commercial liability policy. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2021) §§ 3:33–3:40 [distinguishing standard from nonstandard or "manuscript" insurance policies]; *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1074, fn. 5 [same][citing Croskey, *supra*].)

The type of manuscript policy National sold Pinchevskiy excluded Pinchevskiy's own sloppy construction work from coverage. In other words, if Pinchevskiy's deficient work required repair, that was on Pinchevskiy. It was not the insurer's problem.

The pertinent provision within this policy was "exclusion (k)(6)." This provision is central to this appeal. Exclusion (k)(6) reads as follows, with our italics:

11

"This insurance *does not apply to 'property damage'* to . . . [t]hat particular part of any real property or personal property that must be restored, repaired or replaced *because 'your work' was incorrectly performed* on it."

The case law labels this a "faulty workmanship exclusion." (E.g., *Clarendon America Ins. Co. v. General Security Indemnity Co. of Arizona* (2011) 193 Cal.App.4th 1311, 1325 (*Clarendon*).)

The principle is simple. The insurance company says, "Contractor, you are on the hook for your own bad construction work. We are not."

This commercial arrangement makes common sense.

The issue is moral hazard. It would create a moral hazard for insurance companies to sell insurance to contractors that would tempt the contractors then to exploit by doing cheap construction work for clients, only to leave the insurers responsible for fixing the faults.

We illustrate the issue in concrete but simplified terms. In a small job with no subcontractors, consider how a builder might be enticed to increase the profit on a job by cutting corners. How much steel rebar should the builder buy and lay down before pouring the cement slab: the proper amount to strengthen the slab, or less? How many beams should the builder put in the ceiling before concealing the beams with drywall? How many nails in each two by four? Less steel and fewer beams and nails would cost less, cut the builder's expenses, and increase the builder's profits. Cutting these corners will be invisible, for the shortcuts will be hidden within the floor and behind the paint. Perhaps no one will notice before the first large earthquake. Perhaps that will take decades—or centuries.

The prospect of legal liability for poor work helps deter builders from cutting corners.  (See, e.g., Civ. Code, § 895 et seq.)  But it would dull that discipline if contractors could obtain insurance indemnifying them for the costs of fixing their own shoddy work.  Misguided insurance like that would create a moral hazard.

Moral hazard is the bad incentive the fact of insurance can give to an insured.  The bad incentive is to increase risky or destructive behavior covered by the insurance.  If the presence of insurance tempts insureds to cut corners or to take unwise risks, insurance will have created a perverse and socially undesirable incentive.  (See *Wexler v. California FAIR Plan Assn.* (2021) 63 Cal.App.5th 55, 63, 70–75 [explaining moral hazard generally]; *Western Employers Ins. Co. v. Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027, 1031–1032 [explaining moral hazard in the contractor setting]; cf. *Clarendon*, *supra*, 193 Cal.App.4th at p. 1325 [in this kind of policy, contractors bear the risk of fixing their own faulty workmanship, while insurers bear the risk of damage to the property of others].)

Moral hazard is a general phenomenon in the insurance world.  The hazard is moral because it can tempt good people to do bad things:  to take unwise risks where they profit if all goes well but avoid liability if fortune does not smile.

Allowing a stranger to buy insurance on your life is a classic and extreme example of moral hazard's perverse incentive.  That insurance would tempt the stranger to arrange for your death, to make it look like an accident, and to collect the policy payoff.  (See *Warnock v. Davis* (1881) 104 U.S. 775, 779 [life insurance policies that allow strangers to profit from the

13

"early death" of the insured "have a tendency to create a desire for the event"].)

Judge Posner gives another illustration. He explained an insurance company would not willingly insure a pension plan and its sponsor against an underpayment of benefits. Coverage like that would create an acute moral hazard problem. "Such insurance would give the plan and its sponsor an incentive to adopt aggressive (just short of willful) interpretations of ERISA designed to minimize the benefits due, *safe in the belief that* if, as would be likely, the interpretations were rejected by the courts, *the insurance company would pick up the tab.* Heads I win, tails you lose." (*May Dept. Stores Co. v. Fed. Ins. Co.* (7th Cir. 2002) 305 F.3d 597, 601, italics added (Posner), abrogated on other grounds by *Americold Realty Trust v. ConAgra Foods, Inc.* (2016) 577 U.S. 378, as recognized in *RTP LLC v. ORIX Real Estate Capital, Inc.* (7th Cir. 2016) 827 F.3d 689, 691–692.)

Insurance companies know all about moral hazard. They seek to guard against it. It would be unprofitable for them to encourage insureds to magnify the very risks against which the insurance company is insuring. No insurance company wants to encourage its insureds to game its own system against itself. Rational companies will write policies to eliminate moral hazard.

So it was with National's policy with Pinchevskiy. National's policy evinced a goal of avoiding moral hazard. National did not want to tempt contractors like Pinchevskiy to play heads I win, tails you lose against it. National did insure Pinchevskiy against accidentally harming *other* people. But when it came to insuring the quality of Pinchevskiy's *own* construction work, National's coverage drew the line. To do otherwise would have encouraged Pinchevskiy to save money by

14

cutting corners on quality, "safe in the belief that if [the cut corners caused construction defects], . . . the insurance company would pick up the tab." (Posner, *supra*, 305 F.3d at p. 601.)

B

We now turn to the *property damage* claims by Letgolts and Plattner. The next section takes up their *personal injury* claim.

National's policy excluded Letgolts and Plattner's property claims, which were the results of Pinchevskiy's own faulty workmanship. The faulty workmanship exclusion meant these claims could not support a recovery against National.

The initial and seemingly main reason Letgolts and Plattner were unhappy with Pinchevskiy was that he botched their remodel. He took too long and left too soon. The work he did do was of low quality. Pinchevskiy then used bankruptcy to dodge personal liability for his own substandard performance.

Pinchevskiy's policy with National, however, did not step into the breach. Paragraph (k)(6) excluded Pinchevskiy's faulty workmanship from the policy. The trial court ruling on property damage was correct: National's faulty workmanship exclusion excluded Pinchevskiy's faulty workmanship.

This conclusion has support from lofty sources. Justice Traynor's trim decision in *Volf v. Ocean Accident & Guarantee Corp.* (1958) 50 Cal.2d 373, 373–376 reached a similar decision regarding a similar insurance exclusion. The esteemed Professor Macaulay explained Justice Traynor's ruling made good sense: a contrary decision would have lessened the incentive for the contractor "to exercise care or to make repairs at the least possible cost." (Macaulay, *Justice Traynor and the Law of Contracts* (1961) 13 Stan.L.Rev. 812, 825–826.) The court in *Maryland Casualty Company v. Reeder* (1990) 221 Cal.App.3d

15

961, 967–968 quoted and endorsed Macaulay's analysis. So do we.

In their appellate briefing, Letgolts and Plattner emphasize particular items of damaged property: their pool shed and their driveway. They say the shed and driveway were not within the scope of services in Pinchevskiy's contract and argue this property, therefore, must fall outside the faulty workmanship exclusion.

This argument is incorrect. It lacks support from text, logic, and authority.

The text of the policy contravenes this argument. "This insurance *does not apply to 'property damage'* to . . . [t]hat particular part of any real property or personal property that must be restored, repaired or replaced *because 'your work' was incorrectly performed* on it." (Italics added.) Letgolts and Plattner wanted their shed and driveway repaired because Pinchevskiy wrecked them. The text of the contract excludes those claims.

No logic supports this argument. The rationale for the faulty workmanship exclusion is to force contractors to bear liability for their own defective work. The goal is to ensure contractors do acceptable work. This goal is unaffected by whether the work is within or beyond the scope of a contract. Letgolts and Plattner supply no reasoning to overcome this point.

This argument also lacks legal precedent. In their briefing, Letgolts and Plattner rely on *Tokio Marine Speciality Insurance Company v. Thompson Brooks, Inc.* (N.D. Cal. 2017) 252 F.Supp.3d 753, 760–761, which is irrelevant. The *Tokio* holding was the faulty workmanship exclusion does not apply when a third party, beyond the control of the contractor, is responsible

16

for the property damage. (*Ibid.*) That holding makes good sense but does not apply where no third party was beyond Pinchevskiy's control.

At oral argument and after giving Pierce fair notice, Letgolts and Plattner cited another irrelevant case: *Global Modular, Inc. v. Kadena Pacific, Inc.* (2017) 15 Cal.App.5th 127. Part of *Global* interprets a faulty workmanship exclusion. (See *id.* at pp. 139–144.) *Global* affirmed a summary judgment because there was a fact question about whether the contractor's work was faulty. (*Id.* at p. 144 ["we do not know whether Global's rain protection was defective or simply overcome by heavy rain"]; see also *id.* at p. 141 & fn. 2.) Here, however, the contractor's work *was* defective. Letgolts and Plattner strongly agree this is so. *Global* thus is not pertinent.

We do not address the arguments by Letgolts and Plattner concerning other and cumulative reasons the trial court gave for its ruling. Nor do we address another decision cited at oral argument that the authoring federal district court decided against publishing.

C

This section concerns the *personal* injury claim. The trial court ruled Plattner and Letgolts never presented the personal injury claim to National. In 2020, Plattner testified by declaration as well as in person. She claimed that, on January 15, 2008, she fell down stairs and suffered a concussion, which she later orally reported to a claims adjuster. The trial court in this bench trial evidently did not credit Plattner's tardy, uncorroborated, and self-serving testimony. The court's ruling is clear, although it is implicit rather than express. Substantial evidence supports it. We defer to it.

17

We begin with the trial court's ruling. The court wrote in its statement of decision that there was "NO COVERAGE FOR PLAINTIFF PLATTNER'S *UNDISCLOSED* BODILY INJURY CLAIM." The italics are ours and pinpoint the crux. Plattner's personal injury claim was for her supposed concussion and lacerations from her supposed fall down the stairs. The trial court found Plattner never disclosed this claim to National.

Plattner points out she testified in the bench trial that she had given an oral report of this injurious fall to a claims adjuster.

The trial court rejected this testimony by writing that Plattner's bodily injury claim was "undisclosed."

The trial court did not expand on its succinct finding. It did not write, for instance, "I disbelieve Plattner's testimony about how she fell down." Nor did the court write, "I reject Plattner's claim that she made an oral report of the fall to National's claims adjuster." The trial court did not specify the basis for its finding.

This lack of specificity does not reduce the force of this trial court finding, so long as the record reveals a rational ground that supports it. (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 [in a bench trial, the court may believe or disbelieve uncontradicted witnesses if there is a rational ground for doing so].) The absence of an express credibility finding does not matter when the trial court's implied finding is clear and enjoys rational support. (See *ibid.*).

We indulge all presumptions and intendments in support of the judgment. (E.g., *Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) This fundamental rule is old. (See *Ford v. Holton* (1855) 5 Cal. 319, 321.)

It is understandable that trial judges occasionally are diffident about stating in very direct terms that they reject a

18

party's testimony. A bench trial can be an intimate affair: few may attend, and the regulars may all seem to be worthy people despite their commitment to a litigation dispute that has become overwhelmingly partisan. Over the years, the trial judge may have developed empathy for both parties, despite their perhaps-excessive zeal for their own cause. It can be unpleasant to write the words you know they will read: "I do not believe you." A compassionate trial court may soften the language in its ruling. Gentle words do not detract from the ruling's authority.

Letgolts and Plattner argue the court's finding is "error on its face," because Plattner testified she did fall and did tell the adjuster, and there was no conflicting testimony.

This record gave the trial court a rational basis for rejecting Plattner's credibility. The objective facts of this case made her uncorroborated claim dubious.

Plattner's words in 2008 and 2009 suggested her words in 2020 were a tardy and self-serving invention. Plattner was a practicing lawyer in 2008. She personally wrote two lists of what had gone wrong with Pinchevskiy's failed 2008 remodel. Her lists were very detailed: "Electrical lines to sub-panel cut" and such. Plattner wrote and sent one list on September 11, 2008. She wrote the other on January 20, 2009. Neither time did Plattner say Pinchevskiy defectively built or rebuilt a staircase, which caused Plattner to fall and to suffer lacerations and a concussion. Nor did these detailed lists include anything about Plattner's supposed medical treatment for her concussion and lacerations.

The notion lawyer Plattner listed the problem with an electrical sub-panel but left out her concussion is hard to accept.

The trial court was entitled to conclude the key fact was the evidence that was missing, not the evidence that was present. A

19

concussion is a serious brain injury. Medical bills are a common and verifiable way for plaintiffs to document bodily injury. The trial court noted Plattner's omission of "any reference to a slip and fall or bodily injury." "[N]or is there any reference to medical bills . . . ."

The trial court could infer a simple and rational explanation for Plattner's failure in 2008 and 2009 to include anything about her supposed 2008 fall: her unreported fall did not occur, she did not report it, and Plattner's convenient and uncorroborated 2020 testimony to the contrary was unbelievable. The trial court fairly could conclude Plattner was not credible.

Nor was the trial court required to accept Plattner's implausible explanation for her omissions. Her explanation was as follows, with our italics:

> Q. Ms. Plattner, you authored Exhibit 213, correct? That is your email to [Boris Pinchevskiy's] insurance broker?
>
> A. Yes, I did.
>
> Q. And you said that the purpose of this was to alert Boris' insurance broker or the carrier about your claims, correct?
>
> A. Yes.
>
> Q. You didn't include any of your personal injuries, slip and fall in this, did you?
>
> A. It doesn't look like I did. *I thought it covered damage. I didn't know it covered injury.*

It was reasonable for the trial court to reject Plattner's explanation. Plattner did not explain, and her counsel did not inquire, whether Plattner had a copy of the policy on which she supposedly based her belief. Either way, her explanation falters.

20

If she had a copy, then attorney Plattner testified to a legal understanding of the insurance policy that was backwards: in fact, the policy *included* personal injury and *excluded* property damage. If she did not have a copy, then the basis for her belief is mystifying. Nor did Plattner explain why she would have been making *any* decisions adverse to her cause when making initial demands to an opposing insurance company. The trial court fairly could discount Plattner's explanation.

Letgolts and Plattner contend Marks's November 13, 2009 complaint described and disclosed Plattner's concussion and lacerations from her supposed fall. This argument urges an interpretation of the complaint that is unreasonable. It was reasonable for the trial court to reject this interpretation. Context makes this point.

Context begins by recalling attorney Scott Marks sued three defendants on behalf of Letgolts and Plattner. These three defendants were insurance agent Hartnett, the Fire Insurance Exchange, and Pinchevskiy. Marks used three substantive paragraphs to plead the cause of action against Pinchevskiy.

These three paragraphs follow a logical pattern: duty arose; duty was breached; breach caused injury. We summarize this logical pattern.

Paragraph 41 recounted that Pinchevskiy owed Letgolts and Plattner a duty of reasonable care because the couple retained Pinchevskiy to remodel their house.

Paragraph 42 is the key, for it described *how* Pinchevskiy breached his duty to Letgolts and Plattner. This paragraph alleged seven particulars:

1. Pinchevskiy caused property damage to a pool shed, doors and door frames, wood floors, sprinkler system, security system, brick patio, fireplace, and driveway;
2. He undermined the foundation of the home;
3. He improperly repaired, moved, maintained, and/or installed electrical lines, air conditioning lines, and gas lines;
4. He cut other air conditioning pipes, electrical lines, and gas lines;
5. He improperly constructed a room addition;
6. He violated statutory provisions against job abandonment, substandard work, diverting money, and failing to provide lien protection; and
7. Pinchevskiy failed to account for about $110,000 of Letgolts and Plattner's payment of about $187,000.

Next, paragraph 43 described the kinds of damage Pinchevskiy caused Letgolts and Plattner. First were dollar damages "in an amount to be proven at trial." "As a further direct and legal result of [Pinchevskiy's] professional negligence, each Plaintiff has suffered significant emotional distress, including anxiety, anger, frustration and sleeplessness, as well as additional *trauma* to their respective bodies and mind, shock and injury to their respective nervous systems, all of which continue to cause them great mental, physical, nervous pain and suffering, all in an amount well in excess of the minimum jurisdiction of this Court, in an amount to be proven at trial."

Letgolts and Plattner focus on the word "trauma," which we have emphasized. They say this word shows they had submitted a claim for "bodily injury" that triggered National's duty to defend Pinchevskiy in their suit against him.

22

This argument fails.  National's policy defined "bodily injury" to mean *physical* injury.  With our emphasis, the policy excluded "emotional, mental, or psychological distress, injury, *trauma* or anguish, or other similar condition."  Letgolts and Plattner respond the word trauma must be interpreted to include Plattner's bodily injury from falling down the stairs.  But the trial court disbelieved this testimony.  Even if it had not, paragraph 42 notably omits falling, lacerations, or a concussion, and it is reasonable to interpret "trauma" in paragraph 43 in light of paragraph 42.  A remodeling debacle reasonably could inflict a degree of psychological trauma on homeowners.  Nothing in the complaint reasonably supports a broader interpretation of this word.

## DISPOSITION

We affirm the judgment and award costs to the respondents.

WILEY, J.

We concur:

GRIMES, Acting P. J.          OHTA, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23