Filed 7/2/25  Kitchen Gallery v. AmGUARD Insurance Co. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KITCHEN GALLERY, INC. et al., | B337755 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No.20NWCV00699) |
| AMGUARD INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger T. Ito, Judge.  Affirmed.

Vivoli Saccuzzo and Jason P. Saccuzzo for Plaintiffs and Appellants.

Cozen O'Connor, Michael R. Davisson for Defendant and Respondent.

Developer Villa Madrid, LLC and general contractor Kitchen Gallery, Inc. (collectively appellants) sued subcontractor East & West Plumbing, Inc. (E&W), alleging that its defective work caused damage and delay to their apartment building project. After the trial court imposed terminating sanctions against E&W, appellants obtained a judgment totaling over $1.1 million.

Appellants subsequently brought the instant coverage action against respondent AmGUARD Insurance Co., which issued a businessowner's insurance policy to E&W. Respondent, which declined to defend E&W in the underlying litigation, moved for summary judgment on various grounds, including two "faulty workmanship" exclusions in the insurance policy. The trial court denied the summary judgment motion.

Shortly before trial, respondent moved to bifurcate trial of legal coverage issues from factual damages issues. A different trial court granted the motion over appellants' objections. After briefing and a hearing, the trial court concluded that the faulty workmanship exclusions fully precluded coverage as a matter of law, because it was undisputed that E&W damaged the work of other subcontractors while performing its own defective work. The court accordingly entered judgment for respondent without proceeding to a jury trial phase.

Appellants now contend the court committed structural error by denying them their right to a jury trial, treating the motion to bifurcate as a dispositive motion without providing them proper notice or due process, and/or entering judgment without considering the evidence submitted at summary judgment. They alternatively contend that the trial court

2

construed the faulty workmanship exclusions too narrowly and improperly denied coverage because the damage at issue was outside E&W's scope of work.  We affirm.

# BACKGROUND

## I.    Construction Project and Damage

This case arises from appellant Villa Madrid's development of a 22-unit apartment building in Lakewood.  The project had a target completion date of July 2017, to allow Villa Madrid to take advantage of the summer rental market and refinance its construction loan at a lower rate available for completed projects.

In May 2016, Villa Madrid hired appellant Kitchen Gallery as the general contractor on the project.  Kitchen Gallery in turn hired subcontractor E&W to perform "rough plumbing" work specified in the plans and requirements of the project.  E&W began work in July 2016 and was contracted to complete it by December 31, 2016, or face a $200 penalty for each day it was late.

In November 2016, Kitchen Gallery notified E&W that it had installed the wrong type of drain piping and demanded E&W replace it by December 12, 2016.  E&W corrected the error to Kitchen Gallery's satisfaction in December 2016.  Also in December 2016, E&W obtained a businessowner's insurance policy from respondent, effective December 16, 2016 to December 16, 2017.  The policy, which we discuss in more detail below, covered "property damage" caused by an "occurrence."  However, exclusion k(5) barred coverage of property damage to "[t]hat particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the 'property damage' arises out of those operations."  Exclusion k(6) barred coverage of property damage

3

to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

E&W completed most of its work by April 2017. A city building inspection subsequently revealed that E&W had "double stacked" the vent pipes on the drain lines, preventing the proper ventilation of sewer gases. The inspector issued a compliance notice, requiring correction of the issue before the rough plumbing work could be approved.

To address the compliance notice, E&W added additional vents "in a haphazard way," cutting into the structural walls of the project and cutting out essential framing and firewalls. According to a declaration from a managing member of Villa Madrid who was involved in the project, Kitchen Gallery subsequently had to repair the damage to the framing, as well as "insulation damaged by E&W, stucco work damaged as a result of E&W, [and] water damage caused when E&W vented water pipes in the partially completed Project." Kitchen Gallery also had to perform "electrical work where wires had to be pulled to accommodate the vents E&W failed to install originally, further rough plumbing work that E&W was unable or unwilling to complete," and "considerable trash removal due to E&W's repair work, and additional cleaning." Additionally, Kitchen Gallery had to hire an engineer to ensure the framing of the project was structurally sound. This work cost Kitchen Gallery approximately $93,000.

Kitchen Gallery also paid E&W $218,408.10 for the work it performed. Kitchen Gallery later learned that E&W was not properly licensed and was a suspended California corporation.

Due to the delays on the project, Villa Madrid was unable to refinance its loan and incurred over $70,000 in additional interest carry charges. Villa Madrid also was unable to rent the apartment units as planned in summer 2017.

## II.   Underlying Litigation Against E&W

Appellants jointly filed a complaint against E&W in June 2018. Both appellants asserted causes of action for negligence, negligence per se, fraud, breach of the implied warranties of quality and fitness and workmanlike construction, and claim on contractor's bond. Kitchen Gallery additionally asserted causes of action for breach of contract and disgorgement of monies paid. Appellants obtained entry of default against E&W on August 31, 2018.

Appellants subsequently named E&W's principal, Rene Abelardo Reyes Cardoza (Reyes), as an additional defendant. Reyes timely answered the complaint, and the court granted E&W relief from default in January 2019. In March 2019, Kitchen Gallery notified respondent of the pending action and formally tendered its claims against E&W as an additional insured on the policy. Respondent declined to defend or indemnify E&W, asserting that the claims were not covered under the policy.

Shortly thereafter, E&W and Reyes's counsel withdrew, and E&W and Reyes ceased responding to appellants' discovery requests. The trial court granted several of appellants' discovery motions, including motions for sanctions, and deemed admitted their requests for admission. E&W accordingly admitted that it was "negligent in the performance of [its] work on the [project]," and that its work "was not performed in a workman like manner." It also admitted that it breached its subcontract with

5

Kitchen Gallery, defrauded Kitchen Gallery, and damaged both appellants as alleged in the complaint.

Appellants subsequently moved for and obtained terminating sanctions, resulting in a September 2020 default judgment of $430,269.82 for Kitchen Gallery and $714,312.73 for Villa Madrid.

## III. Instant Coverage Litigation

In December 2020, appellants initiated the instant coverage action. In the operative first amended complaint filed in April 2021, appellants asserted causes of action for breach of statutory duty under Insurance Code section 11580, subdivision (b)(2)[1] against respondent, another insurance company no longer involved in the litigation, and 50 Doe defendants.

### A. Summary Judgment Proceedings

Respondent moved for summary judgment, arguing that the policy did not cover the claims for various reasons. As most relevant here, it argued that even if the policy covered the damages, which it disputed, faulty workmanship exclusions k(5) and k(6) precluded coverage because "the items of damage that gave rise to the lawsuit against E&W were items of damage to property on which E&W was performing its operations" and "related directly to restoring or repairing property because E&W's work was performed incorrectly." Respondent cited several cases in support of this argument, including *Letgolts v.*

---

[1] Insurance Code section 11580, subdivision (b)(2) states that insurance policies must contain a "provision that whenever judgment is secured against the insured…in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment."

6

*David H. Pierce & Associates, PC* (2021) 71 Cal.App.5th 272, 285 (*Letgolts*), which held that exclusion k(6) excluded claims of property damage inflicted by a contractor who "wrecked" portions of the property beyond the scope of his contract.

Appellants opposed the motion for summary judgment. As most relevant here, they argued that the faulty workmanship exclusions should be narrowly construed to reach only the "particular part" of the project on which E&W worked—the plumbing—and not the other, unrelated parts of the project that E&W damaged. Appellants argued that *Letgolts* was distinguishable because it involved a general contractor whose work arguably included the entire project. It urged the court to instead follow other case law, including *Global Modular, Inc. v. Kadena Pacific, Inc.* (2017) 15 Cal.App.5th 127, 137-138, 141 (*Global Modular*), which held that exclusion k(5) applied only to property damage to the particular part of a project on which the insured was actively performing construction activities and exclusion k(6) applied "only to the particular *component* of the insured's work that was incorrectly performed and not to the insured's entire project."

The trial court, Judge Tsao, denied the motion after hearing in May 2023. The court found that there were disputed issues of material fact as to whether the damages were covered "occurrences" within the meaning of the policy and as to when Kitchen Gallery knew that "property damage" occurred. The court did not state that there were disputed issues of material fact regarding the faulty workmanship. Instead, it concluded that *Global Modular*, which involved a subcontractor and narrowly construed the "particular part" language of the exclusions to apply to "very specific parts of the subcontractor's work," was

7

more pertinent and persuasive than *Letgolts*, which involved a general contractor. The court stated that the faulty workmanship exclusions "may exclude E&W/Reyes's work that was incorrectly performed, but does not exclude damages to other parts of the Project," including all the repair and replacement damages articulated in the declaration in the underlying litigation.

Jury trial was set for November 2, 2023.

## B. Bifurcation Proceedings

### 1. Motion and Opposition

On October 18, 2023, the day before the parties' final status conference, respondent filed a motion pursuant to Code of Civil Procedure sections 592 and 598 to bifurcate trial of legal coverage issues from factual damages issues.

Appellants opposed the motion. They argued that it was untimely and that bifurcation "would result in two trials involving the same witnesses and evidence." Appellants also argued that the motion was "in reality, a motion to deprive Plaintiffs of their constitutional right to a jury trial on their entitlement to directly enforce the Judgment against Amguard as a third-party beneficiary under Ins. Code section 11580."

### 2. Initial Hearing

On November 2, 2023, while the motion to bifurcate was pending, the matter was assigned to a different trial court, Judge Ito, for trial.

The trial court continued the matter to November 7, 2023 to hear the motion to bifurcate. The court indicated at the outset of the hearing that it was inclined to "bifurcate the legal issues involving . . . the insurance contract itself." It recognized, however, that there were "some factual disputes that are part of

8

that contract that may be necessary with a jury," namely whether the problems were known before the insurance policy took effect and "the amounts of damages that are appropriate given the circumstances." The court told the parties' counsel before they argued that "I don't want to know" what those damages were, "because I believe that that is a factual determination best left to a jury, but I want to know generically what category of damages fall [*sic*] within the purview of this particular insurance contract."

Counsel for appellants expressed concern that "we are walking on thin ice" in terms of "getting into factual issues that are frankly for the jury to decide." He contended that determining coverage was a factual question, and pointed to appellants' underlying judgment that E&W was negligent. Appellants' counsel also contended that the applicability of the faulty workmanship exclusions was a factual question, because E&W's "particular part was the plumbing system." He nevertheless suggested "that we simply submit some briefs to the court on those issues, as the court directs us to, and then have the court issue a ruling saying this part is not going to be covered; you don't talk about it; this is a factual issue; this is how the court construes this provision, and rather than me putting all the same witnesses on and sort of running through all this stuff."

The court agreed there were some factual issues, but stated, "whether or not it's either an occurrence or not occurrence, no, these are legal determinations that I can make." It added that it was "more than happy to entertain briefing and argument from both sides on specifically the issue or the interpretation of the insurance policy contract," particularly things like "this is an occurrence, this isn't an occurrence; this is an accident, this isn't an accident."

9

After respondent's counsel argued, the court reiterated that it did not "want to be getting facts and dates and so forth" in the briefing. It added, "I don't want to run afoul of counsel's very, very correct argument that this is a right to a jury trial in terms of these factual determinations. So I really, really want to be making only the legal call on this case."

Appellants' counsel proposed that the court hold a "comeback hearing" to hear additional argument and rule on what would be tried to the jury, and then give the parties additional time to prepare for trial in light of the ruling. The court agreed and set a simultaneous briefing schedule and December 1, 2023 hearing. The parties stipulated to admission of the underlying complaint, the insurance policy, and the judgment against E&W.

### 3. Substantive Briefing

In their brief, appellants included a "brief summary of factual background" in which they summarized the project, E&W's work, the damages they suffered, and the underlying litigation. Appellants did not provide citations for any of these facts or indicate that they were disputed. Appellants devoted five pages of their brief to the faulty workmanship exclusions, which they argued should be narrowly construed. They urged the court to follow *Global Modular*, which they characterized as "directly on point" and quoted and discussed at length. Appellants argued that *Letgolts* was distinguishable, because it was a legal malpractice case that involved a "specialized policy" and a general rather than subcontractor. Appellants also discussed other case law relevant to the faulty workmanship exclusions and urged the court to "reject Amguard's efforts to rely on the 'faulty work' exclusions to the Policy as narrowing or eliminating

10

coverage, just as the Court previously did when denying Amguard's motion for summary judgment."

Respondent likewise devoted five pages of its brief to the faulty workmanship exclusions, contending that their plain language precluded coverage of the damages in this case. Respondent asserted that the exclusions were a standard component of general liability policies and were intended to incentivize contractors to exercise care in their work while protecting against "less frequent but potentially large claims for damage to the property of others." Respondent argued that "the damages to the work of other contractors – i.e., to the framing and drywall – was done by E&W when repairing its installation of the venting system, and thus occurred during E&W's operations" and therefore came within the scope of the exclusions. Respondent urged the court to follow *Letgolts*, which also emphasized moral hazard concerns, and argued that *Global Modular* was distinguishable because there was a factual issue regarding the quality of the subcontractor's work.

### 4. Hearing and Ruling

On December 1, 2023, the parties appeared for a hearing or, as the court stated at the outset, a "court trial, specifically on the issue . . . of the applicability and coverage of AmGuard's policy with E&W, . . . the subcontractor, as part of this case." The court informed the parties that it had read and considered their briefing, as well as the case law cited therein, including *Global Modular* and *Letgolts*.

Observing that "both sides argued *Global Modular* in their briefs and previously as part of the case," the court opined that *Global Modular* involved "a genuine factual dispute as to whether or not it was defective work." The court found that

11

distinguishable from the instant case, in which "there is no factual dispute that E&W's work was defective, negligent, not up to code, and the genesis of all of this damage." The court tentatively concluded that "all of these damages are as a result of E&W's shoddy, negligent, defective work. And because of that, all of the subsequent consequential damages are not within the purview of this policy." The court then invited argument from counsel.

Starting from the premise that "there certainly was property damage that would be covered under the policy," appellants' counsel argued that respondent was attempting to construe the faulty workmanship exclusions so broadly as to render the policy illusory. Appellants' counsel argued that exclusions must be construed narrowly, and, when so construed, the "particular part" language in the faulty workmanship exclusions referred to the rough plumbing system only. "[T]heir particular part, East & West, was the rough plumbing system. That was it. Wasn't the framing walls. Wasn't the insulation. Wasn't the electrical. Wasn't the roofing. It wasn't any of those things, period." Counsel asserted that, as in *Global Modular*, "we have a subcontractor whose work is more limited," and "anything else that was outside" the limited contractual scope of E&W's work, i.e., anything aside from the plumbing system itself, "was outside of that exclusion."

Appellants' counsel further argued that "this would be an issue that would have to get resolved by a jury," and the court cannot "necessarily adjudicate those facts . . . as far as what the judgment was, what the basis of the underlying judgment was, the amount of damages of the judgment, and those type of issues." He also asserted that the court was "making this

12

decision in somewhat of a vacuum," since it had not heard testimony or other evidence of the damages. He did not dispute that E&W's work was defective.

Respondent's counsel expressly confirmed the court's understanding that "we all agree it's defective work." He continued, arguing, "and we all agree it's the work product of E&W, starting with the pipe and then with the venting. And when they went to fix the venting, your honor, they did some other damage. But they were in the course of their work at that time. And that is undisputed. And that's why . . . the exclusion swallows up all the damages in this case."

The court remarked that although it was "extraordinarily sympathetic" to appellants' position, "all of these damages, everything. . . . They all spin off because E&W did such terrible work." The court further remarked that interpreting the exclusions as appellants argued "would defy logic" and invite moral hazard, because a subcontractor "could do whatever type of terrible or inadequate work that they want, and they're really not going to be on the hook for anything." The court reiterated that there was a genuine dispute as to whether the subcontractor's work was defective in *Global Modular*, whereas here, "there appears to be no dispute. As a matter of fact, your judgment was articulating that, in fact, this was truly defective work by E&W."

Appellants' counsel acknowledged the court's concerns about moral hazard, but asserted moral hazard occurred only "when the insurance company comes in and fixes the insured's actual work. We're not talking about the insured's actual work. We're talking about damage to other parts of the project. It's different. And all the cases make that distinction." He argued that the cases "make clear if there's damage to other parts of the

13

project, damage to other subcontractors' work, that is not part of the moral hazard. That's the whole purpose of these insuring provisions here." Counsel expressed concern that the court was "swallowing all the coverage with its read of this faulty work exclusion, which is very specific as to a particular part," here, the plumbing only. He explained, "we're not saying 'fix the plumbing.' We're saying, 'deal with the property damage'" to all the other parts of the project, including the delay damages.

The court found that the faulty workmanship exclusions "exclude or prevent the carrier, AmGuard . . . from any exposure as a result of the shoddy, inadequate, and defective work of E&W, their insured." It directed respondent's counsel to prepare a statement of decision. The proposed statement of decision concluded that the faulty workmanship exclusions were "clear and unambiguous" and were not designed "to provide contractors and developers with coverage against claims that their work is inferior or defective." It found "*Letgolts* to be persuasive," distinguished *Global Modular*, and ultimately concluded, "the Policy excludes any damages arising from E&W's operations if the property damage arose from those operations, or if the property had to be restored, repaired or replaced because E&W's work was incorrectly performed. In this case, it is undisputed that the property damage arose from E&W's operations, and that the property damage occurred while repairs to that work was being made. As a result, Exclusion k of the Policy precludes any coverage for the property damage caused by E&W to the Property, and there is no coverage for the judgments obtained by Plaintiffs in the Underlying Action."

After the trial court adopted the proposed statement of decision without modification, appellants objected "to the

14

proposed findings of fact on the grounds that no evidence was admitted (or offered) at the hearing." They asserted that only limited procedural facts were "considered or stipulated to," including the existence and resolution of appellants' underlying action against E&W and Reyes, the existence of the policy, and the existence of the instant action. Appellants further objected that "it was not undisputed that E&W damaged other portions of the project while repairing defective work" and "it was not undisputed that the property damage arose from E&W/Reyes' operations, or that the property damage occurred while repairs to work were being made."

The trial court subsequently issued a minute order stating that it had read and considered the objections but adopted the proposed statement of decision and proposed judgment. It entered judgment for respondent, and appellants timely appealed. We accepted for filing an amicus curiae brief submitted by AmTrust Financial Services, Inc., on behalf of respondent.

## DISCUSSION

Appellants contend that the judgment must be reversed on both procedural and substantive grounds. Procedurally, they contend the trial court committed structural error by depriving them of a jury trial and denying them due process. Substantively, they contend that the trial court erroneously construed the policy. We disagree on both grounds.

## I. Structural Error

Article VI, section 13 of the California constitution "generally 'prohibits a reviewing court from setting aside error unless it finds the error prejudicial,'" even when the alleged error is constitutional in nature. (*F.P. v. Monier* (2017) 3 Cal.5th 1099,

15

1108.)  However, "an error is reversible per se when it constitutes 'a '"structural [defect] in the . . . trial mechanism'" that defies evaluation for harmlessness.'" (*Ibid.*)  "Such errors affect 'the framework within which the trial proceeds, rather than simply an error in the trial process itself,' thus affecting the entire conduct of the trial from beginning to end." (*Severson & Werson, P.C. v. Sepehry-Fard* (2019) 37 Cal.App.5th 938, 950.)  "Structural errors require per se reversal 'because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred.'" (*Id.* at pp. 950-951.)  "In the civil context, structural error typically occurs when the trial court violates a party's right to due process by denying the party a fair hearing." (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 534.)  "Structural errors requiring automatic reversal include denying a party's request for jury trial [citation] and violating a party's right to present testimony and evidence [citation]." (*Ibid.*)

Appellants contend the trial court's "decision to enter judgment in favor of Amguard after previously denying Amguard's motion for summary judgment due to the existence of triable issues of material fact constituted structural error, fundamentally undermining Appellants' constitutional right to a jury trial and a fair hearing."  We reject this contention for three reasons.

First, a "trial court has inherent authority to revisit its ruling on a summary judgment motion and to reach a different conclusion in subsequent proceedings." (*Kerley v. Weber* (2018) 27 Cal.App.5th 1187, 1197, citing *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107.)  Appellants acknowledge the court's authority to revisit its ruling, but assert the court denied them

16

due process by failing to give them appropriate notice that it intended to do so. We disagree. When a court reconsiders a summary judgment ruling, "it should inform the parties of this concern, solicit briefing, and hold a hearing." (*Le Francois v. Goel*, *supra*, 35 Cal.4th at p. 1108.) The parties here were afforded, and took advantage of, the opportunity to brief and argue the coverage and exclusion issues on which the court based its ultimate ruling.

Second, the disputed issues of material fact the trial court identified at summary judgment concerned coverage: were the damages "occurrences" within the meaning of the policy, and did Kitchen Gallery have notice of the damage before the policy became effective. These coverage issues were rendered moot by the court's legal conclusion that the damages would come within the faulty workmanship exclusions in any event. Indeed, at the December 1 "comeback" hearing, appellants' counsel argued from the premise that these issues had already been adjudicated in appellants' favor. Although they now claim they "identified disputed factual issues" necessitating trial, appellants point only to the "brief summary of factual background" section of their bifurcation brief, which included no citations to the record and gave no indication any facts were disputed. Appellants also made no effort to challenge or correct respondent's counsel's representations that the facts were undisputed, or disabuse the court of that notion at the hearing. To the extent they objected after the court adopted the proposed statement of decision, they did so only in general terms and without citing the record.

Third, we agree with respondent that "the jury issue is a red herring." (*Equitable Life Assurance Society v. Berry* (1989) 212 Cal.App.3d 832, 836.) As appellants acknowledge in their

17

opening brief, "interpretation of an insurance policy is a question of law." (*Ameron Internat. Corp. v. Insurance Co. of Sate of Pennsylvania* (2010) 50 Cal.4th 1370, 1377 (*Ameron*).) "Where the trial court concludes…that a writing is not reasonably susceptible of a construction urged, there is no issue to be submitted to a jury. Thus, even if bifurcation had not been ordered, the trial court would have been required to hear the evidence bearing on the meaning of the instrument out of the presence of the jury, and the conclusion the court arrived at would have terminated the case" all the same. (*Equitable Life Assurance Society v. Berry, supra*, 212 Cal.App.3d at p. 836.) Appellants were not guaranteed a particular coverage interpretation in light of the summary judgment ruling or their request for a jury trial.

Appellants next contend that they "were not provided fair notice of the nature of the proceedings that followed from the trial court's order granting Amguard's belated motion to bifurcate."[2] They argue that "[a]t some point," the motion to bifurcate "morphed into a dispositive motion without any of the procedural safeguards afforded to such motions." This alleged change, they assert, "is a basic violation of due process." We are not persuaded. It was clear from the outset of the bifurcation proceedings that the court planned to resolve the legal coverage issues. Although appellants may not have acknowledged it, there was always some possibility that the court would resolve those issues against them and thereby obviate the need for a jury trial of factual issues. The realization of that possibility did not

---

[2] Although they argued below that the motion was untimely under Code of Civil Procedure section 598, appellants no longer pursue that contention here.

18

change the nature of the motion or proceedings, or deprive appellants of due process. Moreover, the court conducted the proceedings in accordance with the briefing and hearing procedure appellants' counsel proposed, and gave appellants' counsel ample opportunity to argue orally and on the papers.

Appellants finally contend it is "even more troubling" that the court "entered judgment against Appellants without even considering the prior evidence submitted in connection with Amguard's motion for summary judgment." They assert that evidence was "critical," and without it, the trial court was making factual rulings "in a complete vacuum" while ostensibly resolving only legal questions of policy interpretation. Appellants cite *Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 135 for the proposition that "[o]ne element of a fair trial is the right to offer admissible evidence on a material issue." To the extent that authority applies here—the cited statement addresses the improper exclusion of necessary expert testimony at trial—it does not persuade us that structural error occurred. The parties stipulated that the court would consider a limited universe of documents, and appellants in their briefing affirmatively provided the court with the factual background they now claim it lacked. Appellants have not established the existence of structural error warranting automatic reversal.

## II.     Policy Interpretation

The trial court concluded that the faulty workmanship exclusions in the policy, k(5) and k(6), barred coverage of appellants' claims. Appellants contend this was error.

### A.     Legal Principles

"In general, interpretation of an insurance policy is a question of law and is reviewed de novo under settled rules of

contract interpretation." (*Ameron*, *supra*, 54 Cal.4th at p. 1377; see also *Yahoo Inc. v. National Union Fire Ins. Co. of Pittsburgh* (2022) 14 Cal.5th 58, 67 (*Yahoo*).) Mindful of the Supreme Court's recent guidance that its "formulation" of the standard articulated in *Yahoo* controls (*Yahoo*, *supra*, 14 Cal.5th at p. 67 fn. 7), we paraphrase that standard here.

The ordinary rules of contract interpretation apply to insurance policies. Accordingly, the parties' mutual intent at the time the contract was formed governs interpretation. To the extent possible, we infer this intent solely from the written provisions of the insurance policy. When the policy language is clear and explicit, it governs. If the terms of the policy are ambiguous, meaning they are susceptible of more than one reasonable interpretation, we interpret them to protect the objectively reasonable expectations of the insured. (*Yahoo*, *supra*, 14 Cal.5th at p. 67.) "'Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer.'" (*Ibid*.) "We may not impose coverage by adopting a strained or absurd interpretation in order to create an ambiguity where none exists." (*Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1497.) The trial court's "threshold determination of ambiguity is subject to independent review." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.)

To ensure that coverage "conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer." (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 322.) "The

20

insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." (*Ibid.*; accord, *Yahoo*, *supra*, 14 Cal.5th at p. 68.)

### B.     Relevant Policy Provisions

The businessowner's insurance policy in this case is nearly 100 pages long.  The parties agree that only a few of its myriad provisions are pertinent here.

The policy provides that "A person or organization may sue us [respondent] to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. . . ."  The limit of the policy is $2,000,000 for each "occurrence."  E&W paid $3,274 for the policy, which was effective from December 16, 2016 to December 16, 2017.

The business liability coverage grant of the policy states that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage,' or 'personal and advertising injury' to which this insurance applies."  The insurance applies to defined terms "bodily injury" and "property damage" "only if: (a) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; (b) The 'bodily injury' or 'property damage' occurs during the policy period; and (c) Prior to the policy period, no [listed] insured . . . and no [authorized] 'employee' . . . knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part.  If such a listed insured or authorized 'employee' knew, prior to the policy period, that the 'bodily injury' or 'property damage' occurred, then any

21

continuation, change, or resumption of such 'bodily injury' or 'property damage' during or after the policy period will be deemed to have been known before the policy period."

The policy defines "property damage" in relevant part as "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." It defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The faulty workmanship exclusions in section k of the policy state that the insurance does not apply to "property damage" to "(5) That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the 'property damage' arises out of those operations; or (6) That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." "Your work" means "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." The policy does not define "that particular part."

### C. Analysis

As a general rule, "before considering whether any exclusions apply, a court must examine the coverage provisions to determine whether coverage exists at all." (*Rosen v. Nations Title Ins. Co.*, *supra*, 56 Cal.App.4th at p. 1497.) That analytical process is consistent with the burden-shifting nature of proving

22

damages are covered: first the insured demonstrates the possibility of coverage, then the insurer may invoke and prove an exclusion. (See *Yahoo, supra*, 14 Cal.5th at p. 68.) Here, however, the parties have largely treated the exclusions as a threshold issue at summary judgment, during the bifurcation proceedings, and in their appellate briefing. Apparently following that lead, the trial court issued a statement of decision that was silent on the issue of coverage. Though the parties now superficially dispute whether the damages at issue fall within the coverage provisions, the bulk of their briefing focuses on whether any coverage would be excluded by exclusions k(5) and k(6). We decline to address coverage in the first instance, with the limited input of the parties. We instead assume for purposes of this appeal that appellants' claimed damages would be covered, and proceed directly to an examination of the faulty workmanship exclusions.

Appellants contend that both exclusions k(5) and k(6) by their plain terms exclude coverage only for "damage caused to specific areas of property that are directly part of the insured's work." They point to the exclusions' usage of the phrase "particular part," which they contend "limits their scope to the smallest specific area that is part of the insured's work." Here, they assert, that is "the plumbing system" and not the "structural walls, electrical systems, insulation, and other components that were not part of E&W's assigned work."

Appellants simultaneously acknowledge, however, that "broader areas of the construction site, including structural and fire walls, . . . were damaged *as a consequence of E&W's actions*," namely its "improper cutting into walls and the resultant water intrusion" while installing the venting required for the plumbing.

23

The fact that E&W damaged the property while engaging in its work places the damages squarely within the ambit of exclusion k(6), which excludes coverage for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

 *Letgolts*, *supra*, 71 Cal.App.5th 272, a recent legal malpractice case from Division Eight of this District that analyzed the same exclusion k(6), is instructive and persuasive. In *Letgolts*, plaintiffs Allen Letgolts and Gabriella Plattner hired a contractor to remodel their home. (*Id.* at p. 275.) The contractor "botched the home remodel," negligently causing "extensive damage" before abandoning the job and leaving the home "'completely uninhabitable.'" (*Id.* at p. 276.) Plaintiffs eventually obtained a default judgment against the contractor, but he was insolvent. (*Id.* at p. 280.) They then sought relief from the contractor's insurance company, but it also went bankrupt before plaintiffs could collect on the judgment. (*Ibid.*) Plaintiffs then sued their counsel for malpractice, alleging counsel negligently delayed in seeking otherwise obtainable recovery from the insurance company. (*Ibid.*) Counsel defended against the action by arguing that any error on his part was harmless, because plaintiffs' claims were not covered by the insurance policy in any event. (*Ibid.*) Plaintiffs appealed after counsel prevailed on this theory at a bench trial, and the appellate court affirmed. (See *id.* at pp. 280-285.)

 The insurance policy at issue contained the same k(6) faulty workmanship exclusion at issue here: "'This insurance *does not apply to 'property damage' to* . . . [t]hat particular part of any real property or personal property that must be restored, repaired or replaced *because 'your work' was incorrectly*

24

*performed* on it.'" (*Letgolts*, *supra*, 71 Cal.App.5th at pp. 281-282,.) Division Eight explained that the principle underlying this exclusion is "simple. The insurance company says, 'Contractor, you are on the hook for your own bad construction work. We are not.'" (*Id.* at p. 282.) The court further explained that "[i]t would create a moral hazard for insurance companies to sell insurance to contractors that would tempt the contractors then to exploit by doing cheap construction work for clients, only to leave the insurers responsible for fixing the faults." (*Ibid.*) The court continued, "It would be very unprofitable for [an insurance company] to encourage insureds to magnify the very risks against which the insurance company is insuring. No insurance company wants to encourage its insureds to game its own system against itself. Rational companies will write policies to eliminate moral hazard." (*Id.* at p. 283.)

The court found that exclusion k(6) "evinced a goal of avoiding moral hazard" by drawing the line at insuring the quality of the contractor's own work. (*Letgolts*, *supra*, 71 Cal.App.5th at p. 284.) It further found that the exclusion was squarely applicable, because the "initial and seemingly main reason Letgolts and Plattner were unhappy with [the contractor] was that he botched their remodel. He took too long and left too soon. The work he did do was of low quality. . . . Paragraph k(6) excluded [the contractor's] faulty workmanship from the policy." (*Ibid.*)

The court rejected the plaintiffs' contention that certain items of damaged property, the shed and driveway, fell outside the exclusion because they were "not within the scope" of the contractor's contract. (*Letgolts*, *supra*, 71 Cal.App.5th at p. 285.) It reasoned that the plaintiffs "wanted their shed and driveway

25

repaired because [the contractor] wrecked them," and therefore the claims were excluded by the phrase "'your work' was incorrectly performed on it." (*Ibid.*) The court further concluded that the plaintiffs' argument lacked logical support, because the goal of the k(6) exclusion "is to ensure contractors do acceptable work," and that goal "is unaffected by whether the work is within or beyond the scope of a contract." (*Ibid.*)

The salient facts and rationale of *Letgolts* are on all fours with this case. Appellants want respondent to pay for repair and replacement of various parts of the building because a subcontractor "wrecked them" while installing the plumbing and related vents. The subcontractor "incorrectly performed" its work, which was the direct cause of damage to parts of the project outside its scope of work. As in *Letgolts*, the goal and plain language of exclusion k(6) preclude coverage of that damage. E&W was engaged in its scope of work, providing venting for the plumbing, when it damaged the work of others. It would not be "objectively reasonable" (*Yahoo, supra,* 14 Cal.5th at p. 67) for an insured to expect coverage for its own defective work. (See *Clarendon America Insurance Company v. General Security Indemnity Company of Arizona* (2011) 193 Cal.App.4th 1311, 1325 (*Clarendon*) ["Exclusions j(5) and (6) show that the parties to the . . . policy intended that [contractor and policyholder] Hilmor bear the risks of faulty workmanship or defective materials."].)

Appellants attempt to distinguish *Letgolts* by arguing that "the contractor in *Letgolts* was a general contractor responsible for the entire project, not a subcontractor working on a discrete aspect of the project as in the present case." This contention is reasonable in the abstract, as courts indeed have distinguished

between "the case of a general contractor, [where] all the work at the project is considered its work product, whereas in the case of a subcontractor, . . ., only its portion of the work, such as siding, is the work product and damage to other parts of the project is considered damage to other property." (*George F. Hillenbrand, Inc. v. Insurance Company of North America* (2002) 104 Cal.App.4th 784, 805; see also *Roger H. Proulx & Co. v. Crest-Liners, Inc.* (2002) 98 Cal.App.4th 182, 196 ["To be covered under a commercial general liability (CGL) policy, such as the policy in this case, the 'property damage' must be to tangible property other than the insured's own work, caused by the insured's defective work."]; *Clarendon*, *supra*, 193 Cal.App.4th at p. 1325 ["'The contractor bears the risk of repairing or replacing faulty workmanship, while the insurer bears the risk of damage to the property of others.'"].)

The very same case law recognizes, however, that "under the proper set of facts, either undisputed or resolved by trial, the faulty workmanship exclusion precludes coverage." (*George F. Hillenbrand, Inc. v. Insurance Company of North America*, *supra*, 104 Cal.App.4th at p. 805.) For instance, in *Clarendon*, *supra*, 193 Cal.App.4th at p. 1326, the court found the faulty workmanship exclusions applicable to claims based on defects and deficiencies resulting from poor workmanship and materials, and rejected as speculative an unsupported contention that some of the deficiencies harmed the work of others. The court in *Global Modular*, *supra*, 15 Cal.App.5th at p. 142 also expressly rejected an insurance company's argument that the faulty workmanship exclusions should apply because it was "based on its view of the underlying policy of CGL insurance and not on an application of the policy language to the facts of the case."

27

Simply put, the facts matter, and the facts here show that E&W caused the damage at issue.

Appellants also contend that we should follow *Global Modular*, *supra*, 15 Cal.App.5th 127, which involved a subcontractor, because it "parallels" this case and is therefore "the proper guiding authority." We disagree.

In *Global Modular*, general contractor Kadena Pacific, Inc. hired subcontractor Global Modular (Global) to build, deliver, install, and partially finish 53 modular units as part of a larger project. (*Id.* at pp. 131-132.) Global's scope of work included the units' framing and drywall, but excluded flooring and roofing. (*Id.* at p. 132.) Because rubberized sheet roofing had to be installed on all 53 units at once, Global "agreed to deliver the units covered only by a roof deck substrate—a three-fourths of an inch base sheet of plywood." (*Id.* at p. 131; see also *id*. at p. 133.)

After Global delivered the units, with the unfinished roof substrate covered with "heavy-duty plastic tarps," rain repeatedly infiltrated the units and damaged the interiors, including the drywall and insulation. (*Global Modular*, *supra*, 15 Cal.App.5th at p. 133.) Kadena alerted Global, but by the time Global hired a remediation provider, Kadena and the roofing contractor had begun installing the rubberized roof. Kadena and Global terminated their contract, and Kadena subsequently remediated the water-damaged units. (*Ibid.*) A jury ultimately found that Global was contractually responsible for the water damage and awarded Kadena slightly more than $1 million. (*Id.* at p. 131.)

Global's insurer, North American Capacity Insurance Company (NAC), subsequently sued Kadena, and the parties cross-moved for summary judgment on the issue of whether the insurance policy required NAC to indemnify Global for the jury

28

award.  (*Global Modular, supra*, 15 Cal.App.5th at p. 131.)  NAC argued that the faulty workmanship exclusions in Global's insurance policy, numbered j(5) and j(6) but substantively identical to exclusions k(5) and k(6) in this case, excluded the damage from coverage.  (See *id.* at pp. 131, 134, 136-137, 139.)  The trial court concluded that both exclusions were "ambiguous and can reasonably be interpreted to exclude damage only to the particular component of Global's work that was defective. Applying this interpretation to the undisputed facts from trial, the court found none of the drywall, insulation, framing, or ducting Kadena repaired or replaced was defective, and thus concluded exclusions j(5) and j(6) did not apply."  (*Id.* at p. 134.)

On appeal, the Court of Appeal rejected NAC's contentions that exclusions j(5) and j(6) precluded coverage. With respect to exclusion j(5), it agreed with Kadena that "the use of the active, present tense construction 'are performing operations' indicates the exclusion applies only to damage caused during physical construction activities." (*Global Modular*, *supra*, 15 Cal.App.5th at p. 137.)

The court further concluded that exclusion j(6) applied only "to the specific part of the insured's work on which the insured preformed faulty workmanship and not, more broadly, to the *general area of the construction site* affected by the insured's work." (*Global Modular*, *supra*, 15 Cal.App.5th at p. 140.)  That is, it applies "only to the particular *component* of the insured's work that was incorrectly performed and not to the insured's entire project." (*Id.* at p. 141.)  The court explained, "based on the undisputed facts from trial, the only arguably defective components or parts of Global's work are the plastic tarps, as they failed to keep the water out.  However, because the jury was

not asked to decide whether Global's waterproofing efforts were incorrect or simply overcome by heavy rains, it is by no means an undisputed fact that the tarps were faulty or Global's placement of them was incorrect." (*Ibid.*)  It later reiterated this point, noting "we do not know whether Global's rain protection was defective or simply overcome by heavy rain." (*Id.* at p. 144.)

The court also found it crucial that there was "no allegation *the items for which Kadena sought repair and replacement costs—* the drywall, insulation, framing, and ducting—*were defective.* Those items were acceptable until it rained and they suffered water damage." (*Global Modular*, *supra*, 15 Cal.App.5th at p. 141.)  It "therefore conclude[d] the trial court was correct in determining exclusion j(6) does not preclude coverage for the repair/replacement costs as a matter of law." (*Ibid.*)

*Letgolts* distinguished *Global Modular* on the ground that "there was a fact question about whether the contractor's work was faulty," because it was unclear if Global's waterproofing was defective or "simply overcome by heavy rain." (*Letgolts*, *supra*, 71 Cal.App.5th at p. 285.)  It contrasted that to the facts of *Letgolts*, where the plaintiffs "strongly agree" that "the contractor's work *was* defective." (*Ibid.*)  We find this distinction persuasive. *Global Modular* expressly rejected NAC's reliance on several cases because they "involve[d] the cost of replacing an insured's defective—as opposed to nondefective—work." (*Global Modular*, *supra*, 15 Cal.App.4th at p. 144.)  Here, as in *Letgolts*, it is undisputed that E&W's work was defective; appellants acknowledge that the damage arose directly from "E&W's improper cutting into walls."

Appellants argue that the damages here nevertheless were "covered consequential damages" because they "were not the

'particular part' of the Project on which E&W/Reyes were performing their work." This interpretation of "particular part" strains credulity and is not objectively reasonable. Venting sewer gas is a crucial part of plumbing and was the particular part of the project E&W was attempting to complete. Although the walls and other elements of the project that E&W damaged were not "plumbing," E&W's shoddy work on the plumbing and related necessary venting was the root cause of the damage. (Cf. *Arroyo v. Unigard Ins. Co.* (9th Cir. 2016) 669 Fed.App'x 881, 882-883 [district court "properly concluded that 'are performing operations' does not exclude only property damage that developed simultaneously as the work was being performed, but also property damage that clearly flows from the insured's work on the property"].) The trial court accordingly did not err in applying the faulty workmanship exclusions and entering judgment for respondent.

## DISPOSITION

The judgment is affirmed. Respondent AmGUARD Insurance Company may recover its costs of appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


COLLINS, J.


We concur:



ZUKIN, P. J.                                    MORI, J.


31